**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARK BUSKING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11 C 1598** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN, Commissioner** | ) | |
| of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Mark Busking, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act as amended ("Act"), 42 U.S.C. § 423(d)(2). Mr. Busking asks the court to reverse the Commissioner's decision and award retroactive disability benefits, or remand the decision for further proceedings. The Commissioner seeks an order affirming the decision.

**I.
PROCEDURAL HISTORY**

Mr. Busking applied for DIB on February 1, 2008, alleging that he had been disabled since May 5, 2007 due to constant pain and anger resulting from a back injury (Administrative Record ("R.") 11, 191, 195). His application was denied initially and upon reconsideration. (R. 11, 117–120, 125–127). Mr. Busking continued pursuit of his claim by filing a timely request for hearing on November 21, 2008. (R. 11, 131–136).

An administrative law judge ("ALJ") convened a hearing on October 7, 2009, at which Mr. Busking, represented by counsel, appeared and testified. (R. 23–24). In addition, Dr. Ashok

Jilhewar testified as medical expert, and Edward Pajawa testified as vocational expert. (R. 18, 21, 23–24). On March 26, 2010, the ALJ issued a decision finding Mr. Busking not disabled because he could still perform his past work as a shipping clerk, as well as other jobs that exist in significant numbers in the national economy.[1] (R. 20–21); *See* 20 C.F.R. §§ 404.955; 404.981. This became the final decision of the Commissioner when the Appeals Council denied Mr. Busking's request for review of the decision on January 4, 2011. (R. 1–3). Mr. Busking appealed that decision to the federal court under 42 U.S.C. 405(g) and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Mr. Busking was born on November 23, 1962, making him forty–six years old at the time of the ALJ's decision. (R. 20, 240). He graduated high school and his able to communicate in English ( R. 194, 202). He worked as a loader/leader for the shipping department at Pepperidge Farm for fifteen years, from 1989 to 2004, and as a shipping clerk for over a year and a half, from September 2005 to May 2007. (R. 196, 204, 213, 172–74). The loader position required him to frequently lift baskets of bread that were fifty pounds or heavier. (R. 197). After he was injured on the job in July 2000, Pepperidge Farm accommodated Mr. Busking with a part-time, seated job until June 2004 (R. 204, 355). Then, in his capacity as shipping clerk from 2005 to 2007, Mr. Busking answered phones, took orders, checked product inventory on the computer, and took customer orders at the shipping window. (R. 206). This position required him to sit for

---

[1] The Administrative Record contains two slightly differing versions of the ALJ's decision, both signed by the judge and labeled with the same date. (R. 8–22, 103–116). However, the two copies to not differ materially, and every idea contained in one version is present in the other.

six hours each day and to walk, stand, and reach only thirty minutes each day. (R. 206). He frequently had to lift ten pounds. (R. 207). He stated that he was discharged from the clerk position "for going home sick." (R. 33, 50).

## B.
## The Medical Evidence

On July 17, 2000, Mr. Busking sustained a work-related injury of the lumbosacral spine at the L4-5 and L5-S1 levels. (R. 195, 410). As a result of his injury, Mr. Busking had a laminectomy in 2001 and a posterior lumbar interbody fusion and posterior lateral fusion procedure in May 2002. (R. 261, 287, 361, 410).

The medical records from Dr. Serna's office cover seven visits by the claimant over seventeen and a half months. R. 281-95. During the first visit on May 18, 2006, Mr. Busking chief complaint was athlete's foot. He also reported that he was "stressed out with life." (R. 281). Dr. Serna noted that the claimant had "anxiety status/mild unipolar disorder" and initiated a prescription of Effexor at 37.5 mg, to increase after a week to 75 mg (R. 281). He also said Mr. Busking "may take" .25 mg of Xanax. (R. 281). Next, Dr. Serna observed that the claimant had chronic back pain status post L4-5, L5-S1 disc herniation status post discectomy with fusion. (R. 281). He continued Mr. Busking on Flexeril and methadone at 10 mg each. (R. 281). A month later, Mr. Busking stated that he was "doing much better with the Effexor" and that "it really seems to have calmed me down." (R. 283). He also reported that he was "not having as much problem sleeping." (R. 283). He had cut down on the medications for his back. (R. 283). Dr. Serna noted that there was no evidence of anxiety or depression, but continued the claimant on Effexor and Xanax. (R. 283). For his back pain, Dr. Serna continued the patient on Methadone 10 mg. (R. 283). On September 14, 2006, Mr. Busking reported that he felt much improved,

3

saying, "I'm doing fine with the Effexor." R. 284. Dr. Serna again found no evidence of depression or anxiety. (R. 284).

Over a year later, on August 29, 2007, Mr. Busking complained of joint pain, which he thought may have been withdrawal because he stopped taking the methadone or a flu bug. (R. 286). He was prescribed Norco 10 mg for the joint pain and continued on Effexor and Xanax. (R. 287). During a November 2007 appointment, Mr. Busking complained of insomnia, for which he had taken multiple medications without relief. (R. 291). He also complained of difficulties with his back and was scheduled for a repeat MRI. (R. 291). His noted active problems included anterior spinal discectomy and anxiety disorder. (R. 291). For his anxiety, the prescription of Effexor was increased to 187.5 mg. (R. 292). Dr. Serna continued Lyrica 75 mg for his back pain, and prescribed Ativan 2 mg for his insomnia. (R. 292). On December 5, 2007, Mr. Busking stated that he felt better. (R. 293). He was continued on Effexor 187.5 mg, Ativan 2 mg, Lyrica 75 mg, and oxycodone 20 mg. (R. 294).

A year and a half later, on July 28, 2008, Dr. Serna wrote that, in his opinion from an internal medicine perspective, Mr. Busking was disabled secondary to his initial injury and subsequent failed surgeries. (R. 410). Dr. Serna asserted that the claimant had chronic back pain, which rendered him unable to stand for prolonged periods of time or sit for longer than fifteen minutes at a time. (R. 410). He noted that the claimant had a cervical neck injury and was "status post cervical laminectomy with decreased range of motion of cervical spine with anterior and lateral flexion." (R. 410).

Mr. Busking also received treatment under several doctors at Pain Centers of Chicago ("Pain Centers") between August 2005 and March 2008. In the earliest progress note in the record, from June 15, 2006, Dr. Jiotis noted that Mr. Busking had failed back syndrome, with

lower back pain that radiated to his hips and down from his buttocks. (R. 311). Mr. Busking described the pain as constant in duration and mild in intensity. (R. 311). Mr. Busking reported that the pain was improved with sitting and reclining and worsened by twisting and bending. (R. 311). Mr. Busking also reported sleep disturbances. (R. 311). On October 17, 2007, Dr. Mauricio Morales noted that Mr. Busking's current regimen of Oxycontin 20 mg did not provide relief for a full twelve hours. (R. 309). He noted that Mr. Busking "is functional at this time" and "claims excellent relief with this medication." (R. 309). Dr. Morales prescribed Lyrica 50 mg in addition to the Oxycontin, and noted that the claimant should be weaned off these medications soon in favor of alternatives. (R. 309). Upon seeing Dr. Tubic on November 14, 2007, Mr. Busking reported "good relief" from back pain due to the Oxycontin, but complained on December 12, 2007 to Dr. Morales that his Oxycontin was not providing sufficient relief. (R. 306, 307). Dr. Morales prescribed an increase of the Oxycontin, which Mr. Busking reported made the pain more manageable upon a visit with Dr. Martini on January 9, 2008. (R. 305). However, his insomnia persisted, causing him to stay awake for two days at a time. (R. 305).

On February 6, 2008, Dr. Tubic noted that Mr. Busking's pain was relatively well-controlled. (R. 304). However, he also noted that Mr. Busking's father was dying in hospice care, which was causing Mr. Busking "significantly more pressure and stress." (R. 304). Therefore, Dr. Tubic approved an additional prescription of Fentora 200 mcg. (R. 304). Mr. Busking's insurance company denied coverage of the Fentora on February 29, 2008. (R. 301). A progress note from Dr. Tubic revealed that Mr. Busking's father passed away on February 8, 2008 and that Mr. Busking was "having a hard time getting comfortable." (R. 300).

On April 30, 2008, Dr. Tubic tried the plaintiff on Cymbalta when Mr. Busking reported that his current dose of Oxycontin only provided around three to four hours of relief and that he

5

still had trouble sleeping at night. (R. 395). During a May 28, 2008 appointment, the plaintiff reported to Dr. Orbegozo that his pain medications only provided 70% relief for four to five hours. (R. 394). Dr. Orbegozo increased his Oxycontin prescription and prescribed Ativan for his insomnia. (R. 394). In a progress note from June 25, 2008, Dr. Morales reported that Mr. Busking was not experiencing any significant side effects from his medication. (R. 393). The most recent progress note in the record from Pain Centers is from July 23, 2008. (R. 391). Mr. Busking reported that the Ativan was helping him sleep at night and that his current medications were "working well overall." (R. 391).

The claimant underwent a magnetic resonance imaging ("MRI") of his lumbar spine on December 24, 2007, which revealed very minimal disc dehydration with, at most, very minimal disc bulges without significant spinal stenosis. (R. 403–404). There was a "moderate-sized nonenhancing sharply defined fluid collection within the laminectomy site at L4-L5 and L5-S1," which was noted to be most likely related to a postoperative seroma. (R. 404).

Dr. Erwin Baukus performed a psychological consultative examination on Mr. Busking on May 8, 2008. (R. 354–359). Dr. Baukus observed that Mr. Busking "ambulated slowly and deliberately" without an assistive walking device. (R. 354). Dr. Busking further recorded that Mr. Busking "currently takes multiple medications, but the only psychiatric medication is Effexor XR 150 and 37.5. Mr. Busking reports that he never has seen a psychiatrist, psychologist, or other mental health professional for outpatient treatment." (R. 355). The claimant reported generalized persistent anxiety and several depressive symptoms, including pervasive loss of interest in almost all activities, appetite disturbances with changes in weight, sleep disturbance, feelings of guilt and worthlessness, and difficulty concentrating and thinking. (R. 356). Dr. Baukus noted that the claimant was oriented, with adequate abstract thinking and

6

coherent, logical speech. (R. 357–358). Mr. Busking reported that he was able to generally take care of his activities of daily living, such as hygiene needs, driving, and light chores. (R. 356). He also stated that he was able to maintain appropriate social behavior, but that he belonged to no social groups and had very limited social contact. (R. 356–357). Abstract thinking was adequate and his judgment was intact. (R. 358). After considering the clinical examination and the claimant's medical history, Dr. Baukus diagnosed Mr. Busking with chronic pain syndrome with depression and anxiety. (R. 358).

On May 17, 2008, Dr. Albert Osei saw Mr. Busking for an internal medicine consultative examination. (R. 360–363). Dr. Osei noted that the claimant asserted that he was not able to function due to his back pain, which he described as a "constant, dull ache with superimposed shooting pain into both legs which occurs about three times a day." (R. 360–361). Mr. Busking said that he only sleeps about forty–five minutes at a time due to the pain, and that he has difficulty lying supine. (R. 360). He also described his neck pain as dull and only 2% of his pain problem, and reported that the pain was relieved by keeping his neck still. (R. 361). The claimant indicated that his anger stemmed from his medical problems and his inability to obtain relief from them. (R. 361). He reported that his anger kept him confined to his room and that he took medication for his anger. (R. 361). But, he reported that his anger did not lead him to be aggressive towards others. (R. 361). Claimant denied having any suicidal thoughts or taking any medication for depression. (R. 361).

Regarding his activities of daily living, Mr. Busking reported that he was able to walk a block without an assistive device. (R. 361). He reported that he could stand and sit for fifteen minutes and could not lift, pull, or push. (R. 361). He reported being able to bathe, dress, and

drive without difficulty or assistance. (R. 361). Dr. Osei observed that the claimant was able to get on and off the exam table with mild difficulty. (R. 362).

Mr. Busking's neck exhibited no adenopathy or tenderness. (R. 362). Mr. Busking exhibited normal ability to grasp and manipulate objects. (R. 362). Also, he was able to fully extend his hands, make fists, and appose his fingers. (R. 362). The range of motion of his joints was normal. (R. 362). Mr. Busking's spine exhibited mild diffuse tenderness. (R. 362). While lateral bending range of motion was normal, the lumbar spine flexion was reduced to fifty degrees. (R. 362). Strtaight leg raising, Tinel's, and Phalen's tests, however, were negative. (R. The cervical spine had reduced range of motion for flexion, extension, rotation, and bending, but had no tenderness. (R. 362). The claimant's deep tendon reflexes were present, equal, and symmetric. (R. 362).

The mental status examination revealed normal affect and no signs of depression, agitation, irritability, or anxiety. (R. 363). Dr. Osei listed five problems as his impression: chronic lower back pain status post laminectomy with reduced range of motion; persistent neck pain status cervical vertebral fusion with reduced range of motion; history of uncontrolled anger from frustration with medical problems; insomnia; and history of non-anginal chest pain. (R. 363). Depression and anxiety were not listed as problems under Dr. Osei's impression. (R. 363).

Dr. Richard Bilinsky, the State agency medical consultant, reviewed Mr. Busking's medical record and performed a physical residual functional capacity ("RFC") assessment on May 28, 2008. (R. 364–371). He found that Mr. Busking could frequently lift ten pounds and occasionally lift twenty pounds. (R. 365). He also determined that Mr. Busking could stand, walk, or sit for six hours in an eight hour work day. (R. 365). He noted that the his push and pull were unlimited. (R. 365). Mr. Busking's gross manipulation and fine manipulation were also

unlimited, but his reaching was limited. (R. 367). In terms of postural limitations, Dr. Bilinsky determined that the claimant could occasionally stoop and occasionally climb ladders, ropes, or scaffolds. (R. 366). Dr. Bilinsky found that the claimant's level and persistence of pain were partially credible due to the disparity between the objective findings and the claimant's self-reported limitations of activities of daily living. (R. 371).

Dr. C. Jusino Berrios, the State agency psychological consultant, also reviewed the medical evidence on June 10, 2008. (R. 372). Dr. Berrios found that Mr. Busking had depression and anxiety secondary to his physical condition. (R. 375). Regarding the "B" criteria of the listings, Dr. Berrios made the following determinations: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (R. 382). Dr. Berrios noted that there was no history of psychiatric hospitalizations. (R. 384). Overall, he determined that Mr. Busking's affective disorder, including his depression and anxiety, were nonsevere. (R. 372, 384).

On September 29, 2008, Dr. Francis Vincent performed a medical evaluation and case analysis, determining that Mr. Busking was partially credible. (R. 412–414). Dr. Vincent noted that the medical evidence of record indicated that the claimant had reported excellent relief with current medications with "no side effects which would prevent him from being functional." (R. 414). He further observed that the evidence from the pain clinic did not support Dr. Orbegozo's determination that Mr. Busking was unable to tolerate sitting due to pain. (R. 414).

Mr. Busking's fusion was extended during another procedure under Dr. Orbegozo on August 20, 2009. (R. 417–418). The procedure was a "two-level percutaneous fluoroscopically aided posterior facet fusion with bone dowel of cadaveric origin at the levels of L2-L3 and L3-

L4." (R. 417). In a letter from September 29, 2009, Dr. Orbegozo noted that Mr. Busking had been his patient for several years, and that all of his treatment of Mr. Busking had been for Mr. Busking's pain. (R. 415). He stated that "the patient is doing quite well after the surgery at this point; however, the patient still is incapacitated to work." (R. 415). Dr. Orbegozo further noted that Mr. Busking had not been able to sit or stand for a long period of time or lift objects that were heavier than five pounds. (R. 415). He stated that he considered the claimant to be permanently disabled and incapacitated to work. (R. 415). He wrote that he wanted "the patient to really remain in as protected [an] environment as possible, which certainly would not be a very physical working environment." (R. 415). Dr. Orbegozo said that he could not foresee any improvement in Mr. Busking's functional status. (R. 415).

The record was held open for 30 days following Mr. Busking's hearing to allow the claimant to supplement the record with documentation regarding his recovery after the surgery. The claimant failed to submit any such records within that time frame. (R. 18).

### C.
### The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

Mr. Busking testified that he originally hurt himself on July 17, 2000. (R. 33). He explained that due to this injury, he had a discectomy in 2001. (R. 33). The discectomy was not successful, so he had a double fusion in 2002. (R. 33). The claimant confirmed that since those surgeries, his weight had remained around 170–175 pounds. (R. 33). He testified that he had a valid driver's license and that he would drive about once a month. (R. 39). He graduated high school and had no education or vocational training subsequent to graduation. (R. 54).

10

Mr. Busking testified that he worked as a leader of distribution for Pepperidge Farm for fourteen years. (R. 37). In this position, Mr. Busking "led by example," which included spotting trailers and loading them with baskets of bread. (R. 37–38). Each basket was around thirty pounds, and he would lift and stack them by hand in the trailers for approximately eight hours a day. (R. 38). He would regularly pick up three baskets at a time, and he estimated that the heaviest load he ever lifted was 150 pounds. (R. 44). The job required constant "bending, twisting, pulling, [and] pushing." (R. 45).

Mr. Busking said that he had to stop working this job in distribution when he was injured on the job on July 17, 2000. (R. 41). The exact circumstances of the injury are unclear from the record, but Mr. Busking testified that the suspension was out for several months on one of the trucks that he had to drive. (R. 41). He alleged that the pain from driving that truck got "so bad" that he "couldn't take it" and was put on disability. (R. 41). Following the injury and throughout the subsequent surgeries, the insurance company tried to place Mr. Busking on light duty in "all different types of positions," but he was unable to work in any of those positions. (R. 42).

Approximately eight months after being put on disability, the insurance company found Mr. Busking a job as a clerk in distribution. (R. 45). Mr. Busking attested that he held this position for around thirteen to fifteen months, working 11:00–7:00 five days a week for $10 per hour. (R. 36–37, 45). He reported that his duties were "[t]aking orders on the phone, working at [the] computer, and taking orders at the window." (R. 36). He stated that he had to stand when working at the window, but that he did not have to crawl, bend, or stoop (aside from getting in and out of his chair). (R. 36). He sat for six hours of the day and stood for two. (R. 45). At the most, he only had to lift ten pounds. (R. 45).

Mr. Busking was terminated from the clerk position for "going home sick." (R. 33, 50). He stated that the last date he worked was May 4, 2007. (R. 33). He testified that he did not try to get another job after that date because "the pain was just getting excruciating," and he "couldn't take it anymore." (R. 33–34). He stated that he had been taking "like six methadone pills a day to get me through work." (R. 34).

After he was terminated from his most recent job, Mr. Busking testified that he would stay at home alone during the day. (R. 50). He maintained that he did not do any shopping and that all he did was watch the news while sitting in his recliner. (R. 51). At the request of his doctor, Mr. Busking would do some stretching exercises in the morning for six to ten minutes a day. (R. 55). He testified that he sometimes went multiple days without showering. (R. 53). He reported that he was able to dress himself, but that he needed his wife to help him with his socks and shoes. (R. 53). He stated that he did not participate in any kind of social activities, aside from occasionally visiting his brother. (R. 52). He asserted that he had trouble sleeping and would sometimes be awake for "four days straight." (R. 51). He said that he had tried many medications to help him sleep, but that nothing had worked yet. (R. 51).

Mr. Busking further attested that he had a surgery in August 2009 on the two levels of discs above his double fusion. (R. 56). He conceded that he did not know whether this surgery was related to his original injury in July 2000. (R. 56). The claimant asserted that he was in constant pain that "just gets worse and worse and worse and worse." (R. 56).

The claimant also answered a number of questions from the ALJ regarding his limitations. He maintained that he could only stand or sit for ten to fifteen minutes at a time. (R. 56). He did not know whether he could walk a block. (R. 57). He asserted that he could tilt and stoop slightly, but that both caused pain. (R. 57). He said that he could not twist. (R. 57). He

estimated that he might have been able to crawl about six feet. (R. 58). Raising his arms over his head was slightly painful, but he was able to reach to the side. (R. 58). He confirmed that he was capable of fine manipulations, including writing or picking up a pen. (R. 60).

When asked by the ALJ what was preventing him from working, Mr. Busking responded that "the pain is just incredible." (R. 60). He described the pain as similar to "getting hit by a two by six across [the] back just constantly," and that "other times it'll be like an ice pick into your back." (R. 60–61). He asserted that pain medication made the pain tolerable for about two hours, but never completely got rid of the pain. (R. 61). He described the pain as ninety-eight percent related to his back. (R. 62). He claimed that his right leg was numb from his knee to his crotch and that he got shooting pains down his leg. (R. 62). He also had pain in his neck and could not rotate his head very far. (R. 62).

Mr. Busking testified that the doctors were concerned about the number and strength of the medications he was taking, as well as his growing tolerance to them. (R. 35). He stated that the doctors were thinking of putting him on a morphine pump. (R. 35). He attested that depending on whether his August 2009 surgery was successful, he might have the pump installed. (R. 63).

Regarding his psychological issues, Mr. Busking testified that he had been taking Lexapro for his anger. (R. 85). His anger began to be a problem in 2006 or 2007. (R. 85). He stated that he had never tried to hurt himself during his episodes of anger, but that he had gotten into verbal arguments. (R. 85). Mr. Busking attested that he had no problems with authority figures or with working with others. (R. 87). The claimant confirmed that he had never received counseling or hospitalization for anything related to his emotional or mental issues. (R. 87). He further confirmed that he could follow written and oral instructions. (R 88).

13

**2.**
**The Medical Expert's Testimony**

Dr. Ashook Jilhewar, an internist, provided expert medical testimony at the hearing. (R. 23, 80). Dr. Jilhewar stated that Mr. Busking's only impairment was degenerative disc disease. (R. 64). He referred to a letter from the Pain Clinic that described the claimant as "functional" and experiencing excellent relief as a result of his medications. (R. 66, 309). Dr. Jilhewar also observed that there was never documentation of any motor deficit or motor weakness by the treating physicians. (R. 69). Because listing 1.04 requires a motor weakness, Dr. Jilhewar stated that, in his medical opinion, Mr. Busking did not meet listing 1.04. (R. 20, 69); 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A.

However, Dr. Jilhewar then asserted that there were two periods to consider. (R. 70). The first period lasted from May 5, 2007 (the alleged onset date) until February 6, 2008. (R. 70). Dr. Jilhewar opined that during this period, Mr. Busking would not have been able to stand six hours in an eight hour work day, and would thus have been limited to a sedentary work capacity. (R. 70). Dr. Jilhewar further commented that Mr. Busking was able to frequently lift ten pounds, sit indefinitely, and stand or walk for a cumulative two hours in the work day. (R. 71). According to Dr. Jilhwar's analysis, the claimant could balance and stoop occasionally and could not crawl, squat, crouch, or use ladders or ropes. (R. 72).

Dr. Jilhewar said that the second period started on February 6, 2008, when Mr. Busking's father passed away (R. 67, 72). Dr. Jilhewar emphasized that February 6, 2008 was an important date because the pain clinic physician said on that date that Mr. Busking required Fentora for his pain, which is a "significantly more important" drug than the drugs he had been taking up to that point. (R. 68). Dr. Jilhewar testified that Mr. Busking would equal listing 1.04A because of the

14

severity of the pain, the decision to ask for additional surgery, and the psychological issues relating to the death of his father. (R. 72–73). Depending on whether the August 2009 surgery would turn out to have been successful, Mr. Busking might have also met Listing 1.04A. (R. 72–73). However, because the hearing was held before the doctors could tell whether the surgery was a success, Dr. Jilhewar admitted that his determination concerning the listing was not definitive. (R. 73). The ALJ held the record open for thirty days to allow the plaintiff to submit evidence regarding his recovery from the surgery; however, the plaintiff failed to submit such evidence within that time frame or before the ALJ issued her decision. (R. 18, 100).

Dr. Jilhewar then noted that the plaintiff's testimony was not consistent with the MER, asserting that the symptoms described by the plaintiff's testimony "are like 100 percent more serious than [those] document[ed] in [the] medical records." (R. 78). Dr. Jilhewar described failed back surgery as "consistent pain after the back surgery" and attested that hundreds of patients can work despite having failed back surgery. (R. 78)

### 3.
### The Vocational Expert's Testimony

Edward Pajawa testified as the vocational expert ("VE") at the hearing. First, the VE covered Mr. Busking's past relevant work. He described Mr. Busking's position as distribution leader as having a specific vocational preparation ("SVP") number of five, which is semi-skilled, with a medium level of physical tolerance per the Dictionary of Occupational Titles ("DOT") and "at the heavy level of physical tolerance SVP requirement." (R. 89). Next, he attested that the clerk position had an SVP of four, which is at the low end and is semi-skilled. (R. 89). The clerk job was "at the light level of physical tolerance per the DOT and at the sedentary level of physical tolerance as he performed it." (R. 89). The VE testified that, considering "the claimant's

15

age, education… work experience," and limitations, Mr. Busking was able to do this past clerk job "as it's normally performed at the light level of physical tolerance [and] as he performed it at the sedentary level of physical tolerance." (R. 90).

Further, the VE confirmed that Mr. Busking would be able to perform the work required of two other occupations. The claimant would have been able to perform as an information clerk, which has an SVP of four. (R. 89). There were 4,600 positions as information clerk within the Chicago metropolitan region at the time of the hearing. (R. 90). Also, the claimant could work as an order clerk, which features an SVP of four and 6,950 positions within the Chicago metropolitan region. (R.90).

## D.
## The ALJ's Decision

The ALJ found that the claimant's severe impairments included status post cervical and lumbar fusions and degenerative disc disease. (R. 13). Because Mr. Busking's affective disorder did "not cause more than minimal limitations in the claimant's ability to perform basic mental work activities," the ALJ found the mental impairment to be nonsevere. (R. 13). In support of her finding regarding the mental impairment, the ALJ consulted the "paragraph B" criteria. (R. 13); 20 C.F.R. Part 404, Subpart P, Appendix 1. Regarding the first three areas of these criteria (activities of daily living; social functioning; and concentration, persistence or pace), the ALJ recounted the relevant evidence and testimony and concluded that the affective disorder caused no more than "mild" limitations. (R. 13–14). Concerning the fourth area, the ALJ found that there were no episodes of decompensation which have been of extended duration. (R. 14).

Next, the ALJ determined that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1. (R. 14). The ALJ explained that in order to meet Listing 1.04A, the claimant must have "a disorder of the spine resulting in a compromise of a nerve root or the spinal cord with evidence of nerve root compression." (R. 14). Because such evidence was absent from the record, the ALJ found that the claimant did not meet Listing 1.04A, despite the medical expert's testimony that the claimant might meet the listing. (R. 14-15).

The ALJ found that the claimant had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that he can only stand or walk in fifteen minute intervals, can only occasionally balance or stoop, and can never crouch, crawl, squat, or climb ladders, ropes, or scaffolds. (R. 15). In arriving at her conclusion, the ALJ reviewed the evidence at length, including the testimony of Mr. Busking and Dr. Jilhewar and the medical records from Pain Centers, Dr. Orbegozo, Dr. Serna, Dr. Osei, Dr. Baukus, and the State agency medical and psychological consultants. (R. 15–19). After careful consideration of this evidence, the ALJ found that the claimant's allegations were not fully credible "regarding the severity and persistence of his symptoms as well as the functional limitations that they allegedly cause." (R. 19). The ALJ provided three reasons for this finding. First, Mr. Busking had reported on several occasions that the medications provided him relief from his symptoms. (R. 19). Second, his activities of daily living, his social functioning, and his concentration, persistence, or pace were subject to only mild limitations. (R. 19). Third, the examinations of Mr. Busking by Dr. Serna, his treating physician, revealed no abnormal findings. (R. 19).

The ALJ gave great weight to the opinion of Dr. Berrios, the State psychological consultant, because "the overall evidence supports the findings that the claimant's alleged mental impairment is not severe." (R. 19). The opinion of Dr. Bilinsky, the State medical consultant, was afforded "some weight" because the cumulative evidence suggested that the claimant was

17

more limited than Dr. Bilinsky had concluded. (R. 19). In addition, while the ALJ acknowledged that she "must consider opinions from treating physicians," the ALJ provided three reasons for according "little weight" to the opinions of Mr. Busking's treating physicians, Dr. Serna and Dr. Orbegozo. (R. 19). First, the doctors' stated conclusion that Mr. Busking was disabled was a conclusion that is reserved to the Commissioner to make. (R. 19). Second, Dr. Orbegozo's opinion was not supported by any examination reports or specific findings. (R. 19). Third, Dr. Serna's opinions were inconsistent with his treatment notes, which did not document any abnormal findings. (R. 19).

The ALJ gave great weight to the opinions of Dr. Jilhewar, the testifying medical expert, regarding Mr. Busking's functional abilities because the overall objective evidence supported those opinions. (R. 19). However, the ALJ gave little weight to Dr. Jilhewar's suggestion that Mr. Busking's impairment might have met or equaled Listing 1.04A after January 6, 2008. (R. 19–20). The ALJ provided several reasons for giving this portion of the testimony less weight. First, subsequent consultation reports indicated that Mr. Busking's depression was not at the severe level, so Dr. Jilhewar's analysis was not supported by the record. (R. 19–20). Second, the claimant had not sought treatment or counseling for his depression. (R. 20). Third, Dr. Jilhewar was an internist, not a psychologist or psychiatrist, so mental health issues were not his specialty. (R. 20). Fourth, Dr. Jilhewar admitted that he could not make a definitive assessment regarding the claimant's recovery from his August 2009 surgery. (R. 20).

The ALJ concluded that the claimant's RFC for sedentary work did not preclude him from performing past relevant work as a shipping clerk as he actually performed it. (R. 20). Further, based on alternative findings, the ALJ found that the claimant was capable of performing "other occupations with jobs existing in significant numbers in the national

18

economy," including information clerk and order clerk. (R. 21). Therefore, the ALJ determined that the claimant was not under a disability from May 5, 2007 through the date of the ALJ's decision, March 26, 2010. (R. 21–22).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir.2008), *citing Richardson v. Perales,* 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger,* 516 F.3d at 544; *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion,*108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir.2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir.2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger,* 516 F.3d at 544; *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the]

19

conclusion." *Dixon,* 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir.2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger,* 516 F.3d at 544; *Eichstadt v. Astrue,* 534 F.3d 663, 665–66 (7th Cir.2008).

## B.
## The Five-Step Sequential Analysis

Section 423(d)(1) defines "disability" as an: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day,* 467 U.S. 104, 107 n. 1(1984); *Skinner v. Astrue,* 478 F.3d 836, 844 (7th Cir.2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir.2005); *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir.2004). An affirmative answer leads

either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §

416.920; *Briscoe,* 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir.1989). A negative

answer at any point, other than step 3, stops the inquiry and leads to a determination that the

plaintiff is not disabled. 20 C.F.R. § 404.1520; *Stein,* 892 F.2d at 44. The plaintiff bears the

burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five.

*Briscoe,* 425 F.3d at 352.

## C.
## Analysis

Mr. Busking asserts that the ALJ committed numerous errors. In terms of errors of law,

the plaintiff alleges that the ALJ erred by: failing to consider Mr. Busking's affective disorder in

the RFC determination; improperly weighing medical opinion evidence; failing to adequately

explain why she rejected medical expert testimony of disability; and making an improper and

vague credibility determination. (*Memorandum in Support of Plaintiff's Motion for Summary

Judgment*, at 6). Finally, the plaintiff broadly contends that the ALJ's decision is not supported

by substantial evidence. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*,

at 14).

## 1.
## The ALJ Considered Mr. Busking's Mental Impairments in the RFC Determination

Mr. Busking asserts that the ALJ erred by failing to consider Mr. Busking's affective

disorder in the RFC determination.  When determining the claimant's RFC, the ALJ "must

evaluate all relevant evidence… including evidence of impairments that are not severe." *Barnett

v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2010) (citing 20 C.F.R. § 404.1545(a)); *see also Craft v.

Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). At this fourth step, the ALJ must take into

consideration the aggregate effect of all ailments, including those ailments that she determined to

21

be nonsevere at the second step. 20 C.F.R. § 404.1523; *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir.2008). Mr. Busking argues that the ALJ's RFC determination did not "analyze [his] anxiety disorder after the second step" and did not "consider the limitations imposed by [his] anxiety disorder." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 8). Therefore, Mr. Busking contends, the ALJ violated the regulatory requirement by ignoring "Mr. Busking's mental impairments in her RFC determination" and "only [including] limitations of a physical nature." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 8).

Contrary to Mr. Busking's assertions, the ALJ said she analyzed and considered his mental impairments in making the RFC determination. In starting her discussion of the Mr. Busking's RFC, the ALJ confirmed that "[i]n making this finding, I have considered all symptoms" and that she considered his "combination of impairments." (R. 14, 15). *See Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)(held it sufficient that the ALJ stated that he had considered claimant's combination of impairments and all symptoms). The ALJ then evaluated at length the medical evidence regarding Mr. Busking's mental impairments. (R. 16–18). For example, the ALJ observed that Dr. Serna's office notes indicated no evidence of depression or anxiety. (R. 16). In addition, the ALJ noted that Dr. Osei's consultative examination reflected that Mr. Busking was not taking medication for depression and that there "were no signs of depression, agitation, irritability, or anxiety." (R. 17). Furthermore, the ALJ gave great weight to Dr. Berrios's determination that Mr. Busking's "alleged affective disorder was not severe" because that determination was supported by "the overall evidence." (R. 18, 19). Throughout the record, there was no indication that Mr. Busking's very mild psychological impairment had any

combined effect with his back impairment. *See Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002)(ALJ must consider impairments in the aggregate "when the record shows that the impairments have some 'combined effect.'").

The ALJ also evaluated Dr. Jilhewar's testimony about Mr. Busking's mental impairments. (R. 18–20). The ALJ gave "little weight" to this portion of Dr. Jilhewar's testimony for several reasons: consultation reports indicated that the mental impairment was nonsevere; Mr. Busking had not sought counseling; and Dr. Jilhewar did not specialize in mental health issues. (R. 19–20). Thus, the ALJ did expressly "consider" and "analyze" Mr. Busking's nonsevere mental impairments in her RFC determination. Any resultant limitations were so mild or minimal that they did not restrict Mr. Busking's ability to do sedentary work.

## 2.
## The ALJ Properly Weighed the Medical Opinion Evidence of Record

### a.
### The ALJ Was Not Required to Give Controlling Weight
### To The Opinions of the Treating Physicians

The plaintiff's second argument has two parts, both concerning the "treating physician rule." According to this rule, the ALJ should generally accord more weight to opinions from treating physicians because they are likely to be the sources who can best provide a "detailed, longitudinal picture" of the medical impairment and a "unique perspective" of the medical evidence. 20 U.F.C. § 404.1527(c)(2). The ALJ should give controlling weight to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. *Id.*; *see also Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). "[O]bviously, once

23

well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight," and the opinion of the treating physician becomes "just one more piece of evidence for the administrative law judge to weigh." *Hofslien v. Barnhart*, 439 F.3d 375, 376–77 (7th Cir. 2006).

The plaintiff first argues that the ALJ violated the treating physician rule by failing to give controlling weight to the opinions of Dr. Serna, Mr. Busking's treating internist, and Dr. Orbegozo, Mr. Busking' treating pain management physician. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 9). However, the ALJ gave proper justifications for not according controlling weight to these opinions. The ALJ found that Dr. Orbegozo's opinions were not well-supported by the objective medical evidence, observing that his opinions were "not supported by any examination reports" and that "he did not set forth any specific findings." (R. 16, 17, 19). Additionally, the ALJ properly found that Dr. Serna's opinions were inconsistent with other evidence. The opinions of Dr. Serna, the ALJ noted, were contradicted by his treatment notes, "which had documented no abnormal findings during his examinations of the claimant." (R. 16, 19).

In note after note from Mr. Busking's treating physicians, there is no indication of any limitation in his range of motion. There are no negative straight leg raising tests. There are no positive signs from tests like Tinel's or Phalen's. There are no indications of strength or motor deficits. The reasons the ALJ provided for not according weight to treating doctors' opinions could not have been more valid. *Schreiber v. Colvin*, 2013 WL 1224905, *6 (7th Cir. 2013). If there are any notes to support the doctors' opinions, Mr. Busking does not point to any in his briefs. Because the opinions of Dr. Orbegozo and Dr. Serna were inconsistent with the record

and not well-supported by the objective medical evidence, the ALJ acted appropriately in not giving those opinions controlling weight.

### b.
### The ALJ Properly Employed the 1527(c) Factors for
### Weighing the Treating Physician Opinions

Alternatively, the plaintiff argues that the ALJ "failed to employ the factors set out in 20 C.F.R. § 404.1527(c)." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 9). When an ALJ does not give the treating source's opinion controlling weight, the ALJ should use the factors mentioned in 1527(c)(2) as a guide in deciding how much weight to accord the opinion. *Hofslien*, 439 F.3d at 377. These factors include: the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization of the treating source; and other factors that the claimant brings to the ALJ's attention. § 404.1527(c)(2)(i)–(6). If the ALJ chooses to discount a treating physician's opinion, the ALJ is only required to minimally articulate good reasons for doing so. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Contrary to Mr. Busking's argument, an ALJ is not required to undertake an in-depth analysis of each and every one of the factors set out in S 404.1527(c)(2). The minimal articulation requirement is a "lax" one. *Elder,* 529 F.3d at 415. *See* the discussion in *Mueller v. Astrue,* 2012 WL 1802075, 1 -2 (N.D.Ill.2012). While the ALJ did not explicitly mention the list of factors, the ALJ did clearly utilize a couple of the 1527(c) factors in her analysis. The main point to be remembered – and one that Mr. Busking does not dispute – is that the treating physicians' opinions were not supported by their treatment notes and were inconsistent with the balance of the medical evidence. That alone is ample reason to discount their opinions without

reciting the remaining factors chapter and verse. *See Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012)(ALJ need not weight every factor where doctor's opinion is unsupported and inconsistent with the record); *Elder*, 529 F.3d at 415–16 (affirming denial of benefits where ALJ discussed just two of the relevant factors); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007)(same).

To require more would be meaningless formality. For example, Mr. Busking argues that the ALJ should have explicitly addressed two other factors: the specialization of Dr. Orbegozo and the length of time that Drs. Serna and Orbegozo treated Mr. Busking. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 9–10). But what possible substance could these considerations supply here where neither doctors' treatment notes supported their rather dire assessments of Mr. Busking's capacity for work. Dr. Orbegozo could be the world's leading specialist on pain, but if he provides no support for his opinion – no *logical* bridge as it were – his opinion is of no value. Similarly, Dr. Serna could see Mr. Busking on a daily basis for a decade and if he has no record of any abnormal examinations results, his conclusory opinion is meaningless and highly suspect. We must keep in mind the biases that a treating physician may bring to the disability evaluation. The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may "'bend over backwards to assist a patient in obtaining benefits.'" *Punzio v. Astrue,* 630 F.3d 704, 713 (7th Cir.2011) and may too quickly find disability. *Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir.2001).

Dr. Orbegozo's September 2009 opinion on Mr. Busking's pain symptoms related to his specialty in pain management. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 10). Indeed, the specialization factor states that the ALJ should "generally give more weight to the opinion of a specialist about medical issues related to his or her area of

specialty than to the opinion of a source who is not a specialist." § 404.1527(c)(5). However, Dr. Orbegozo's opinion did not explain how any of his medical conclusions were "related" to Mr. Busking's pain. As the ALJ put it, the opinion "did not set forth any specific findings." (R. 19). Dr. Orbegozo mentioned Mr. Busking's pain only once, asserting without elaboration at the conclusion of his opinion that "everything [that] has been done is for the management of his pain." (R. 415). Aside from that statement, the opinion is comprised only of conclusory statements. For example, Dr. Orbegozo asserted that Mr. Busking was "still incapacitated to work" and had a total, permanent disability, with the inability to stand or sit for long periods of time or lift objects heavier than five pounds. (R. 415). Dr. Orbegozo provided no explanations as to how these conclusions were specifically related to Mr. Busking's pain symptoms. Because Dr. Orbegozo did not substantively relate his conclusions in his opinion to his specialization in pain management, his opinion does not qualify for greater weight under the specialization factor.

Moreover, as the ALJ noted, determinations regarding the claimant's disability status or residual functional capacity are "reserved to the Commission." (R. 19); 20 C.F.R. §404.1527(e)(1)–(2); *see also Denton*, 596 F.3d at 424; *Dixon*, 270 F.3d at 1177. Opinions from medical sources on these matters are not considered to be medical opinions because "they are administrative findings that are dispositive of a case." §404.1527(e). Thus, such opinions do not even qualify for consideration under the 1527(c) factors, which only apply to medical opinions. § 404.1527(d)(3). The ALJ was therefore wholly justified in not according greater weight to Dr. Orbegozo's conclusory and non-medical opinions that Mr. Busking was permanently disabled and incapacitated to work. (R. 29, 415).

Also, Dr. Orbegozo provided a second opinion on June 2, 2010, over two months after the ALJ issued her decision. (R. 422). The plaintiff does not mention this opinion, much less

argue that it should have been entitled to greater weight under the specialization factor. Thus, the plaintiff has waived the argument. *Carter*, 413 F. App'x at 905.

Second, the plaintiff contends that the ALJ should have explicitly considered the length of time that Drs. Serna and Orbegozo treated the plaintiff. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 9). The regulations hold that "[g]enerally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." § 404.1527(c)(2)(i). A few cases address the question of whether the length and frequency of treatment by a treating physician can be substantial enough to warrant remand where the ALJ did not explicitly consider them as a factor. In *Larson*, the Court remanded where the treating physician had treated the plaintiff "for several years on a monthly basis." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). Similarly, the Court remanded in *Campbell* where the treating physician had treated the plaintiff on a monthly basis for fifteen months. *Campbell*, 627 F.3d at 308. Evidence of nine visits to the treating physician over almost two and a half years was not enough to warrant remand in *Dampeer*. *Dampeer v. Astrue*, 826 F. Supp. 2d 1073, 1083 (N.D. Ill. 2011). But time alone is never enough to require that an ALJ blindly accept the treating doctor's conclusions.

The plaintiff argues that remand is warranted because the ALJ did not expressly address length and frequency of treatment as a factor when determining the weight of the treating physicians' opinions. Although the ALJ did not explicitly analyze the length and frequency of treatment as a factor in this context, such a discussion would not have affected the amount of weight she accorded to those opinions. The evidence Pain Centers show that Dr. Orbegozo saw Mr. Busking only three or four times over a period of longer than two years (October, 21 2005 through December 12, 2007) before performing the August 2009 surgery. (R. 298–299). Indeed,

28

Mr. Busking confirmed in his testimony that he was regularly treated by different doctors upon his visits to Pain Centers and that he rarely saw Dr. Orbegozo. (R. 86). Also, the records from Dr. Serna's office include only seven visits over approximately eighteen months. Thus, the length and frequency of treatment under both Dr. Orbegozo and Dr. Serna are not comparable to the monthly examinations in *Larson* or *Campbell*. Moreover, the records from both doctors fail to meet even the length and frequency of treatment that was found to not be substantial in *Dampeer* (nine visits over two and a half years). 826 F. Supp. 2d at 1083. Therefore, explicit consideration of the factor regarding length and frequency of treatment would not have "caused the ALJ to accord greater weight" to the opinions of Dr. Orbegozo and Dr. Serna.

Finally, the plaintiff argues that the ALJ disregarded the 1527(c) factors by giving more weight to the medical evidence from non-treating sources than to the treating physician opinions. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 8, 10–11). The ALJ gave "little weight" to the opinions of Dr. Serna and Dr. Orbegozo, "some weight" to the opinions of the State agency medical consultant, Dr. Bilinsky, and "great weight" to the opinions of the State agency psychological consultant, Dr. Berrios. The plaintiff contends that the opinions of the State agency consultants should have been given less weight because the consultants "had not examined or treated Mr. Busking, did not have any unique expertise that made them more qualified to provide an opinion regarding Mr. Busking's limitations than his own doctors and did not review the 2009 [medical] evidence." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 10-11).

Contrary to the plaintiff's assertion, the ALJ did not disregard the 1527(c) factors in her analysis. In fact, the ALJ analyzed the consultants' opinions in line with the consistency factor. § 404.1527(c)(4). The ALJ gave great weight to Dr. Berrios's opinions because they were

supported by the overall evidence. (R. 19). She only gave some weight to Dr. Bilinsky's opinions because "the overall evidence shows that the claimant is more limited than was determined by the State agency medial consultant." (R. 19). The plaintiff does not contest the accuracy of these assessments, and has thus waived the argument. *Carter*, 413 F. App'x at 905. By explaining that she gave the opinions a degree of weight equal to their consistency with the record, the ALJ built "an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles*, 483 F.3d at 486. Thus, the ALJ succeeded in minimally articulating the reasons for her RFC assessment, which rests "on a sufficient factual basis to support its ultimate conclusion." *Berger*, 516 F.3d at 545; *see also Dixon*, 270 F.3d at 1176. No more is required.

c.

**The Logical Bridge and
The Minimal Articulation Requirements**

As occurs so often where catch phrases are involved, the term, "logical bridge" has taken on a life of its own as though it were some self-defining and exacting test, which requires that an ALJ's decision be viewed grudgingly. But, as Justice Holmes warned, courts must be wary of the uncritical and indiscriminate use of labels and catch phrases: "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing—phrases which originally were contributions, but which, by their very felicity, delay further analysis...." Holmes, *Law and Science and Science and Law,* 12 Harv. L. Rev. 443, 455 (1899). Judge Posner, who coined the phrase in *Sarchet,* would be the first to acknowledge that it was not meant as a formula. *Compare, e.g., United States v. Edwards,* 581 F.3d 604, 608 (7th Cir.2009)(

"We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 990 (7th Cir.2004).

The point Judge Posner sought to make in *Sarchet* was that unexplained conclusions by Administrative Law Judges, no less than by federal judges, are not persuasive and preclude meaningful appellate review – a point that had been made years earlier in *Herron v. Shalala,* 19 F.3d 329 (7th Cir.1994), on which *Sarchet* relied.   In *Herron*, the court said: "Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence. Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some *minimal* level his analysis of the evidence.'" *Id.* at 333–334 (citations omitted)(emphasis added).

Thus, it is plain that the"logical bridge" requirement is not about *elegantia juris*. The ALJ need not build the Pont Neuf. A simple trestle bridge will suffice so long as it allows the reviewing judge to traverse the divide between the evidence and the conclusions. The ALJ's explanations in this case do that and more.

### 3.
### The ALJ Properly Explained Her Reasons for Giving Little Weight to a Portion of the Medical Expert's Testimony

As previously mentioned, the ALJ need only "minimally articulate [the] reasons for crediting or rejecting evidence of disability." *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1995). Under this standard, the ALJ need not discuss every piece of evidence, but "the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry*, 580 F.3d at 475. If the ALJ rejects relevant and uncontradicted evidence, she must explain her reasons for doing so.

*Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). In this explanation, the ALJ must build a logical bridge from the evidence to her conclusion. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The ALJ's explanation should be given a "commonsensical reading" and should not be needlessly or pedantically nitpicked. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

The plaintiff argues that the ALJ erred "when she failed to provide an adequate explanation for rejecting the testimony of the medical expert." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 11). Dr. Jilhewar split Mr. Busking's claimed time span of disability into two periods, with February 6, 2008 as the dividing date between them. (R. 70). Dr. Jilhewar's testimony regarding the period beginning February 6, 2008 is slightly confusing. But, it seems that he believed that Mr. Busking would equal Listing 1.04A for this period because of his "psychological issues about his family circumstances, including the severity of pain and a decision by the treating physician to ask for additional surgery." (R. 72–73). This opinion is crucial, because if an ALJ determines that a claimant meets or equals a disorder covered in the Listing of Impairments, the ALJ must find the claimant per se disabled. 20 CFR §404.1525.

The plaintiff contends that the ALJ rejected the portion of Dr. Jilhewar's testimony regarding the listing only because it did not "support her ultimate conclusion." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 12). Indeed, according to the plaintiff, the ALJ failed "to provide any cogent rationale for adopting one portion of Dr. Jilhewar's testimony while rejecting the rest." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 12). Thus, according to the plaintiff, the ALJ failed to "minimally articulate" her reasons for rejecting the testimony. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 11).

32

The plaintiff's contentions present a distorted view of the record and defy common sense. To begin with, contrary to the plaintiff's assertion, the ALJ did not reject the relevant portion of Dr. Jilhewar's testimony; instead, she merely gave it "little weight." (R. 19–20). Therefore, she did not "ignore" the testimony, and her opinion was partially "based upon it." *Terry*, 580 F.3d at 475; *Clifford*, 227 F.3d at 871. Of course, an ALJ is free to accept, reject, or weigh the various portions of a physician's opinion, as long as she provides a valid explanation. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)(ALJ properly rejected a portion of doctor's report as inconsistent with the record). Here, the ALJ's reasons for giving the relevant portion of Dr. Jilhewar's testimony "little weight" are sufficient.

Mr. Busking ignores the fact that the ALJ provided two strong reasons for her determination. First, the ALJ explained that Mr. Busking "has not treated with a psychiatrist or sought counseling." (R. 20). This assertion is supported by the plaintiff's own testimony. When the ALJ asked, "You never saw anybody and you've never been hospitalized for anything related to emotional or mental issues, is that correct?" Mr. Busking responded, "Yeah." (R. 15, 87). Second, the ALJ noted that Dr. Jilhewar conceded that his assessment was not definitive because the hearing was held "prior to the expected recovery" from the August 2009 surgery. (R. 20, 72–73). Both of these reasons build a logical bridge from the evidence to the ALJ's decision to give Dr. Jilhewar's testimony little weight.

The plaintiff does contest two of the other reasons provided by the ALJ. However, the plaintiff's reasoning in both contentions is easily rebutted. The plaintiff's first argument is nonsensical. The ALJ observed in her opinion that Dr. Jilhewar "is an internist, not a psychologist or psychiatrist," and that mental health issues are not his medical specialty. (R. 20). The plaintiff contends that this observation is irrelevant to Dr. Jilhewar's testimony that Mr.

33

Busking equaled Listing 1.04A because the listing does not pertain to mental health issues. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 12).

The plaintiff appears to misunderstand the meaning of the word "equal" when used in relation to the Listing of Impairments. When a claimant "equals" a listed impairment, that means that he does not "meet" all of the required criteria of the listing—either because he does not exhibit all of the criteria or because his medical findings are not of the requisite severity. 20 CFR § 404.1526(b)(1)(i). Yet, if the claimant exhibits additional medical findings that are not expressly mentioned by the required criteria, but are nonetheless "of equal medical significance" to those criteria, then the claimant's impairment is "medically equivalent" to the listing. 20 CFR § 404.1526(b)(1)(ii). Thus, determining that a claimant "equals" a listing necessarily requires the consideration of factors that are not expressly mentioned in that listing.

In this case, Mr. Busking's psychological issues are just such a factor. Psychological issues do not expressly pertain to Listing 1.04A. Regardless, Dr. Jilhewar stated that Mr. Busking equaled Listing 1.04A "only because" of his "psychological issues about his family circumstances," which were medically equivalent to the required criteria. (R. 73). Thus, the ALJ's observation that Dr. Jilhewar does not specialize in psychological issues is eminently relevant to her weighing of Dr. Jilhewar's testimony.[2] It was logical to conclude that since Dr. Jilhewar is not a specialist in psychological issues, then his opinions regarding the effects of a claimant's psychological issues are entitled to less weight.

---

[2] What is particularly perplexing is that right after insisting that the listing does not pertain to psychological issues, the plaintiff insists that Dr. Jilhewar properly determined that the plaintiff satisfied the listing *because* of his psychological issues. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 12–13). The plaintiff's argument is blatantly at odds with itself, insisting that Dr. Jilhewar did *not* consider psychological issues while simultaneously insisting that he *did* consider psychological issues.

Second, Mr. Busking challenges the ALJ's reasoning that "subsequent consultation reports... indicate that the claimant's depression is not at the severe level." (R. 19–20). The plaintiff spends the better part of a page complaining that the ALJ was cryptic in her citation of "subsequent consultation reports." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 13). Mr. Busking assumes that "subsequent consultation reports" means consultation reports that were provided subsequent to the administrative hearing and Dr. Jilhewar's testimony. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 13). He notes that the only consultative reports in the record are dated May 8, 2008, and May 17, 2008. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 13). Dr. Jilhewar provided his testimony on October 7, 2009. (R. 23). Therefore, he deduces that the ALJ could not have been referring to the May 2008 consultative reports because they were provided before, and not subsequent to, the administrative hearing. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 13). With no reports left to look to, Mr. Busking concludes, "It remains unclear why the ALJ found the unspecified (and likely nonexistent) 'subsequent consultation reports' sufficient to reject evidence of Mr. Busking's disability." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 13).

The plaintiff has given the phrase "subsequent consultation reports" a meaning that is illogical and very unlikely given the context in which the ALJ used it. The ALJ clearly did not mean those consultation reports "subsequent" to Dr. Jilhewar's testimony, but instead those consultation reports "subsequent" to February 6, 2008. In the rest of the paragraph leading up to this phrase, the ALJ put special focus on this date and the period that followed it, as February 6 is the date after which Dr. Jilhewar said the plaintiff "'would equal' Listing 1.04A." (R. 19). Moreover, this is the only interpretation that gives the ALJ's words any logical meaning, as both

35

consultation reports were provided subsequent to February 6, 2008. (R. 354, 360). Perhaps, for the sake of clarity, the ALJ could have been more explicit about which consultative reports she was referring to. However, that criticism amounts to no more than mere nitpicking, and interpreting "subsequent" to mean "subsequent to February 6, 2008" is a "commonsensical reading" of the ALJ's explanation. *Shramek*, 226 F.3d at 811.

The plaintiff does not challenge the ALJ's assertion that the consultation reports performed by Dr. Osei and Dr. Baukus "indicate that the claimant's depression is not at the severe level." (R. 19–20). Therefore, he has waived the opportunity to make that argument. *Carter*, 413 F. App'x at 905. Nevertheless, the ALJ's description of the consultative reports was sufficient to support this assertion. In Dr. Osei's report, Mr. Busking "reported he was not taking any medication for depression." (R. 17, 361). Dr. Osei found "no signs of depression, agitation, irritability or anxiety." (R. 17, 363). Dr. Baukus's report noted that Mr. Busking was "able to take care of his personal needs" and "to maintain appropriate social behavior." (R. 18, 356, 357). Dr. Baukus also observed that Mr. Busking "was cooperative and friendly." (R. 18, 355).

Therefore, contrary to the plaintiff's contentions, the ALJ provided four valid reasons for giving Dr. Jilhewar's testimony little weight. Because these observations are sufficient to build a logical bridge from the evidence to the ALJ's conclusion, the ALJ succeeded in "minimally articulating" her reasoning, and her determination must stand. *Scivally*, 966 F.2d at 1076.

## 4.
### The ALJ's Credibility Determination Was Proper

The ALJ found that Mr. Busking's allegations were "not fully credible," and that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" her RFC assessment. The plaintiff argues that

this determination was faulty because it failed to "pinpoint which of Mr. Busking's statements the ALJ found to be credible and which statements she found to lack credibility." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 14). However, the "ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 313 (7th Cir. 2012); *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). Therefore, the ALJ was under no duty to "pinpoint" each statement of the plaintiff and categorize it as "credible" or "lacking credibility."

Instead, the ALJ's only duty was to provide an explanation that was reasonable enough to support her conclusion. *Getch*, 539 F.3d at 483; *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *see also Dornseif v. Astrue*, 499 F. App'x 598, 600 (7th Cir. 2013). Indeed, the ALJ provided three reasons – all of which Mr. Busking ignores in his brief -- to support her credibility finding. These reasons are not patently wrong, and Mr. Busking does not challenge their validity, so such a challenge is deemed waived. *Carter*, 413 F. App'x at 905; *Skarbek*, 390 F.3d at 505; *Schoenfeld*, 237 F.3d at 793. In any event, the record supports all three reasons.

First, the ALJ noted that Mr. Busking "reported on various occasions that he has experienced relief from the medications." (R. 16, 19, 283, 284, 309, 391, 402). Second, she observed that Mr. Busking only had "mild limitations in activities of daily living, social functioning and with maintaining concentration, persistence, or pace." (R. 13–14, 19, 225, 228, 229). Third, the ALJ explained that the medical records from Dr. Serna, Mr. Busking treating physician, "revealed no abnormal findings." (R. 16, 19, 281–292). Since the credibility determination is reasonable and supported by the evidence, it is not patently wrong and cannot be overturned by this court.

**5.**

**a.**
**The ALJ's Decision Is Supported by Substantial Evidence**

The plaintiff contends that the ALJ's decision is not supported by substantial evidence. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 14). The plaintiff asserts that "[t]he medical evidence and testimony of record, when read in its entirely, overwhelmingly support a finding that Mr. Busking is disabled." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 14). Mr. Busking's inability to engage in competitive work activity, the plaintiff maintains, is clearly illustrated by "[t]he objective treating evidence of record along with the opinion of the treating physician and Mr. Busking's testimony…" (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 14).

Yet, the plaintiff in this portion of his memorandum provides no citations to the record to support his assertions. A brief "must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record." *Desilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999). "[W]e will not root through the hundreds… of pages that make up the record… to make [the plaintiff's] case for him." *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004). "As we have repeated time and again, 'Judges are not like pigs, hunting for truffles buried in [the record].'" *Gross v. Town of Cicero, III*, 619 F.3d 697, 702 (7th Cir. 2010) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Thus, the Court does not need to address Mr. Busking's broad, uncited assertion.

Regardless, Mr. Busking's argument that the treating physicians' opinions and Mr. Busking's testimony required a finding of disability is without merit. As earlier explained, the ALJ properly gave the treating physicians' opinions little weight and properly found the plaintiff's testimony to be not fully credible. The ALJ gave little weight to the treating

38

physicians' opinions because they were inconsistent with the record and were not supported by treatment notes or specific findings. (R. 19). Additionally, their opinions that Mr. Busking was disabled were non-medical opinions that were reserved to the Commissioner to make. (R. 19). Regarding the plaintiff's testimony, the ALJ noted that Mr. Busking "reported on various occasions that he has experienced relief from the medications" and that he had "only mild limitations in activities of daily living, social functioning and with maintaining concentration, persistence or pace." (R. 19). Moreover, Mr. Busking's testimony was unsupported by Dr. Serna's records, which contained no abnormal findings. (R. 19). Therefore, the plaintiff's testimony and the treating physicians' opinions do not "overwhelmingly support a finding that Mr. Busking is disabled." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 14).

Furthermore, contrary to the plaintiff's contention, the ALJ's decision is supported by a substantial amount of the "objective treating and examining evidence of record." (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 14). The court must affirm the ALJ's decision if it is supported by a substantial amount of evidence. 42 U.S.C. § 405(g). As mentioned earlier, substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger*, 516 F.3d at 544. The ALJ here certainly cited to enough treating and examining evidence to reasonably support the finding that Mr. Busking is not disabled. For example, at Pain Centers, Dr. Morales observed that Mr. Busking was functional and claimed excellent relief with his medication. (R. 16, 309). Mr. Busking reported to Dr. Martini that Oxycontin was making his pain more manageable. (R. 16, 305). Dr. Tubic noted that the plaintiff's pain was relatively well-controlled. (R. 16, 304). Mr. Busking also reported in July 2008 that his medications were working well overall. (R. 16, 391).

A reasonable mind would also accept the objective medical evidence cited by the ALJ as sufficient to support her conclusions regarding Mr. Busking's mental impairments. For instance, Mr. Busking reported to Dr. Serna that the medications for his affective disorder helped to calm him down and make him feel "much better." (R. 16, 283). Also, Dr. Osei found no signs of depression or anxiety upon examining the plaintiff. (R. 17, 363). Additionally, Dr. Berrios, the State agency psychological consultant, concluded that Mr. Busking's alleged affective disorder was nonsevere. (R. 18, 372, 384). Because all of this objective evidence is reasonably sufficient to support the ALJ's finding that Mr. Busking was not disabled, the ALJ's decision is supported by substantial evidence.

### b.
### The Plaintiff's Subsequent Award of Benefits Does Not Necessitate Remand

Mr. Busking attached to his Memorandum an August 18, 2011 decision by Attorney Advisor Horowitz that found Mr. Busking disabled starting on March 27, 2010. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment, Exhibit A*). Mr. Busking observed that this onset date is one day after the ALJ issued her decision on March 26, 2010, and noted that he experienced no "intervening injury or event" between March 26 and March 27. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment* at 15). Thus, as Mr. Busking would have it, the ALJ erred in finding the plaintiff not disabled for the period of May 5, 2007, to March 26, 2010. Or, of course, the Attorney Advisor erred. Or, neither the ALJ nor the Attorney Advisor erred. The substantial evidence standard allows for the affirmance of an administrative decision so long as there is more than a mere scintilla of evidence in the record to support it. As such, an ALJ's opinion – or an Attorney Advisor's opinion – will be affirmed even if reasonable minds could differ as to whether the claimant is disabled. *Schreiber v. Colvin*, 2013 WL 1224905, 10 -

11 (7th Cir. 2013); *Shideler*, 688 F.3d at 306; *Elder*, 529 F.3d at 413.

Regardless, the Attorney Advisor nowhere in her decision expressed disapproval of the ALJ's March 2010 opinion denying Mr. Busking benefits. Instead, the Attorney Advisor made clear that her determination was based on "the recent records" postdating the ALJ's decision. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment, Exhibit A* at 5). The only piece of evidence dated by the Attorney Advisor that was also considered by the ALJ was the evaluation performed by Dr. Baukus on March 8, 2008. (R. 18; *Memorandum in Support of Plaintiff's Motion for Summary Judgment, Exhibit A* at 4). The Attorney Advisor's opinion does not mention or criticize the ALJ's treatment of Dr. Baukus's evaluation. Accordingly, the Attorney Advisor's opinion does not support the contention that the Administration disapproved of the ALJ's March 2010 opinion.[3]

---

[3] The Attorney Advisor's opinion is not evidence that can inform our review. This court must limit its review to the "pleadings and transcript of record." 42 U.S.C. 405(g). The court may only incorporate new evidence into its review when the plaintiff shows that there was "good cause for the failure to incorporate such evidence into the record in a prior proceeding" and that such evidence is material. *Id.* Evidence is only material if it "could have affected the outcome of the ALJ's decision." *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005). Thus, evidence that postdates "the ALJ's decision, unless it speaks to the patient's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement." *Getch*, 539 F.3d at 484. Here, the Attorney Advisor's opinion is not part of the transcript of record. Moreover, the opinion only regards Mr. Busking's disability status beginning on March 27, 2010. The ALJ's opinion regarded Mr. Busking's disability status for the period of May 5, 2007 to March 26, 2010, and the administrative hearing was held on October 7, 2009. Thus, the two opinions regard mutually exclusive periods of time, and the Attorney Advisor's opinion does not "speak to [Mr. Busking's] condition at or before the time of the administrative hearing." *Getch*, 539 F.3d at 484. Therefore, the Attorney Advisor's opinion "could not have affected the ALJ's decision," and it cannot be considered material. *Id.*; *see also Presley v. Commissioner of Social Sec.*, 23 Fed. App'x. 229, 231 (6th Cir. 2001).

**DATE:**

## CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.


ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** August 14, 2013